2006 OK CR 38

**Pearl SMITH, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2004–857.**

Court of Criminal Appeals of Oklahoma.

Sept. 15, 2006.

As Corrected Sept. 28, 2006.

Park Medearis, Tahlequah, OK, counsel for appellant at trial.

Sandra Mulhair Cinnamon, Oklahoma Indigent Defense System, Norman, OK, counsel for appellant on appeal.

Richard Gray, District Attorney, Janet Bickle Phillips, Assistant District Attorney, Tahlequah, OK, counsel for the State at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, counsel for the State on appeal.

## OPINION

LUMPKIN, Vice–Presiding Judge.

¶ 1 Appellant Pearl Smith was charged and tried by jury for First Degree Murder (21 O.S.2001, § 701.7(A)), Case No. CF–2003–220, in the District Court of Cherokee County. The jury found Appellant guilty of the lesser offense of Second Degree Murder (21 O.S.2001, § 701.8) and recommended as punishment twenty-eight (28) years imprisonment. The trial court sentenced accordingly. It is from this judgment and sentence that Appellant appeals.

¶ 2 Appellant raises the following propositions of error in support of her appeal:

1. Defense counsel provided ineffective assistance of counsel.

2. The prosecution's gender based exclusion of female jurors violated Appellant's right to equal protection and due process of law.

¶ 3 After a thorough consideration of these propositions and the entire record before us on appeal including the original record, transcripts, and briefs of the parties, we have determined the conviction should be reversed and the case remanded for a new trial.

¶ 4 Just before 10:00 p.m., June 10, 2003, William Cunningham received a phone call from his neighbor, Appellant, asking him to come to her home to help her. Appellant sounded somewhat agitated to Cunningham, but he thought one of her goats had merely gotten stuck in the fence again. Cunningham finished his dinner, put his shoes on, and drove to Appellant's home. Arriving in approximately five minutes, Cunningham entered the front door to find the victim, Appellant's husband, lying on the floor. He had a gunshot wound to the chest. Cunningham immediately checked the victim for a pulse but found none. Cunningham asked Appellant what happened and she admitted to shooting him, saying she couldn't take another beating. Cunningham found Appellant to

be "rather hysterical" and took approximately 15 minutes to calm her down before calling 911 to report the shooting. As Cunningham spoke with Appellant, he noticed a 9mm automatic pistol on the table. Appellant admitted that was the gun she had used to shoot the victim.

¶ 5 The Sheriff and her deputies arrived soon thereafter. The 9 mm pistol on the table was confiscated. It still had a live round in the chamber, but the gun was jammed so as not to fire. Emergency medical personnel determined the victim was dead at the scene.

¶ 6 Appellant was *Mirandized*[1] and agreed to speak with the deputies. She admitted to shooting the victim and using the gun on the table to do so. She later gave deputies a written statement and testified at trial. Essentially, she stated that she and the victim had been married since 1987. She said that during the early years of the marriage, the victim was not abusive, but demanding. Then beginning in "the late 1980's" he became physically abusive by shaking, hitting and pushing her, and twisting her arm behind her back. She said he would double up his fist and hit her, usually on her back where it would not show. She said the beatings got worse through the years. He told her not to tell anyone because it would make him lose his job and then he would make her sorry for telling. He told her he would "snap her like a twig".

¶ 7 She said the victim had carried a gun for years and would greet people at the door to their house with a gun. She said that for a period of time, the victim worked out of town during the week and was home only on the weekends. She said he told her to mow the grass while he was gone, and when he returned home, he would measure the grass to make sure it had been mowed to his specifications. She told about another time when she painted the bathroom pink. The victim didn't like pink, and told her she could not eat or sleep until it was repainted. She said if his dinner was not cooked exactly the way he wanted, he would throw it at her. One time she suggested something he should do in a class he was teaching and he slapped

her so hard her glasses flew off and she fell to the ground. Another time, he got so mad he broke the door frame to the bedroom.

¶ 8 Appellant said she thought about leaving the victim several times but did not have any money. In order to have some money, she began raising goats. She said she was fairly successful and several people purchased goats from her. Appellant said the victim did not like the business and did everything he could to ruin it. She said the victim's abuse caused her to have migraines and raised her blood pressure. Appellant said that near the end of May 2003, she had surgery on her wrist which had been broken years before but never reset. After her surgery she was unable to milk the goats as she had been doing. She said the victim was mad because she had the surgery and because he had to milk the goats. (She said she had tried to dry up the goats' milk but had not been completely successful).

¶ 9 Appellant said that in the month prior to the shooting, the victim got meaner. He routinely kicked the dog out of his way and shot her cat. One day when she and the victim were both outside, the victim threw her down in a ditch and "beat the dickens out of" her. She said they had been arguing for about 10 days before the shooting. The night of the shooting, she had a migraine, took medicine for it and lay down. She awoke to the victim shaking her, telling her to get up, calling her a "lazy bitch" and demanding dinner on the table. As Appellant cooked dinner, the victim told her he wasn't going to milk the goats anymore. Despite the fact her wrist was still in a splint, she gathered together the items necessary to milk the goats. She said this only made the victim madder. He grabbed the things from her, said he wanted dinner on the table when he got back, and pushed her out of the way. Appellant said she just couldn't take it any more and began to cry. When the victim returned and saw her crying, he got even madder, and shouted at her. Appellant said she ran to her bedroom to get away from him. Once in the bedroom, she noticed the gun lying on a table. She said she picked it

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

up, but sat down on the bed. Appellant said she was not really thinking about what she was doing. She said the victim continued to yell at her and threatened to come into the bedroom to get her. She didn't want him to come into the bedroom because he had broken the door frame 10 days earlier.

¶ 10 Appellant said the next thing she knew, she was back out in the living room. The victim was sitting at a table. She said it wasn't until she saw his eyes widened that she realized she still had the gun in her hand. She said the victim got up, slammed his fist on the table, and said, "right here, right now; if you think you're big enough". Fearing another beating from the victim, Appellant said she fired the gun at him. Appellant said she couldn't take it anymore and felt she had no choice. She then put the gun to her own head and pulled the trigger. Appellant said the gun jammed, adding "God hates me." She said she did not remember anything that happened afterwards.

¶ 11 Appellant admitted she had never told anyone about the beatings, nor had she filed any police reports regarding the victim's abusive treatment of her. The defense presented nine (9) witnesses at trial who testified to observing various incidents of the victim's abusive behavior toward Appellant. However, the defense did not present an expert on Battered Woman's Syndrome, instead relying on "generalized self-defense." [2]

¶ 12 In her first proposition of error, Appellant contends she was denied the effective assistance of counsel for the following reasons: 1) the failure to procure and present an expert on Battered Woman Syndrome, a decision which cannot be considered sound trial strategy; 2) the failure to respond to the State's discovery request with witness summaries sufficiently informative to put the State on notice of the defense witnesses' expected testimony; 3) the failure to present evidence relevant to the Battered Woman Syndrome; 4) the failure to be an effective advocate for Appellant by failing to adequately investigate the crime scene and be prepared to exploit the fact the State had not

conducted a crime scene investigation; and 5) the failure to object to the State's use of peremptory challenges and intentionally discriminating with defense counsel's own peremptory challenges.

¶ 13 In regards to her claims concerning the Battered Woman Syndrome (BWS), Appellant argues counsel's failure to present the "obvious and appropriate defense" of BWS in light of the evidence supporting such a defense constitutes ineffective assistance of counsel. In support of her argument, Appellant relies on *Bechtel v. State,* 1992 OK CR 55, 840 P.2d 1, and *Paine v. Massie,* 339 F.3d 1194, 1201 (10th Cir.2003). In these cases, this Court and the Tenth Circuit Court of Appeals said that when an attorney represents a battered woman claiming self-defense, the attorney should put on an expert to explain BWS to the jury. While an expert is not mandatory, each case will be reviewed on the facts to determine if an expert should have been used. In *Paine,* the Tenth Circuit Court of Appeals held that under the circumstances of that case, counsel's failure to present an expert on BWS to the jury was objectively unreasonable. 339 F.3d at 1202–1203.

¶ 14 In pre-trial hearings in the present case, defense counsel informed the court that Appellant's defense was self-defense and that he was "not specifically" relying on BWS. Defense counsel stated he was going to present evidence "of a long standing history of domestic violence that's consistent with his attack on her the night of the killing". Defense counsel indicated the defense did not have an expert on the issue of BWS. He told the court, "that had been an issue at one point and we have been in contact with some experts, but decided against using them." [3]

¶ 15 Along with her appellate brief, Appellant filed an application for an evidentiary hearing on 6th Amendment claims pursuant to Rule 3.11(B)(3)(b), *Rules of the Court of Criminal Appeals,* 22 O.S.2001, Ch. 18, App. After thoroughly reviewing the attached affidavits, this Court found the application set forth "clear and convincing evidence" necessary under Rule 3.11(B)(3)(b)(i) to demon-

---

2. Trial counsel's description of the defense presented at trial. (Tr. Evid.Hrg., Vol.II, pg.60).

3. Tr. Mtn. Hrg., pgs. 17–26.

strate a strong possibility trial counsel was ineffective in failing to present an expert witness on BWS. Therefore an evidentiary hearing was ordered. The District Court of Cherokee County was directed to make findings of fact and conclusions of law regarding: 1) the trial availability of the evidence or witnesses named in the application; 2) if available at the time of trial, whether the witnesses would testify in accordance with their statements contained in the affidavits; 3) the effect of the evidence or witnesses on the trial court proceedings; and 4) whether the failure to the use the evidence or witnesses was trial strategy and why that strategy was chosen.

¶ 16 Pursuant to this Court's order, an evidentiary hearing was held and Findings of Fact and Conclusions of Law were timely filed with this Court. As to its Findings of Fact, the trial court stated: that the witnesses were available at the time of trial and would have testified consistent with their affidavits; at trial the defendant did not present a defense of self-defense by reason of BWS; the evidence adduced at trial and at the evidentiary hearing clearly supported a BWS defense; counsel was aware of the viability of this defense prior to trial; counsel's failure to raise a BWS defense was not trial strategy but rather a failure in communication resulting in the defendant's inability to understand the importance of hiring an expert in support of the BWS defense; and there is a reasonable probability that presentation of the witnesses and a BWS defense would have substantially affected the trial proceedings.

¶ 17 As for its Conclusions of Law, the District Court said:

Trial counsel for Appellant is an able attorney who is well qualified to try cases such as this. However, recognizing that the evidence showed that Appellant was battered and planning to present a self-defense case, it was trial counsel's duty to hire an expert to examine Appellant for BWS and to testify at trial. . . .

Therefore, in light of the evidence presented at the evidentiary hearing and at trial, it is the ruling of this Court that defense counsel's actions in the context of this case did not fall within the wide range of reasonable professional conduct. Moreover, there is a reasonable probability that, but for counsel's error, the outcome of the trial would have been different. Accordingly, the Court finds that counsel provided ineffective assistance of counsel and the Court recommends that Appellant be granted at new trial. (internal citations omitted).

¶ 18 In her Supplemental Brief on Remanded Evidentiary Hearing, Appellant raises two allegations: 1) the District Court's Findings of Fact and Conclusions of Law are supported by the evidence; and 2) the evidence presented at the evidentiary hearing established that defense counsel was ineffective for failing to investigate, prepare his case, and present relevant evidence at trial. In its response brief, the State replies that the finding of ineffectiveness was not sound as to either the facts or the law. The State asserts the record shows the decision not to hire the BWS expert was made by Appellant and that trial counsel, after explaining the benefit of having such an expert, merely followed his client's wishes in not retaining or presenting a BWS expert. Further, the State argues this Court has not mandated that an attorney put on an expert witness to explain BWS to the jury. The State asserts the brief statement in *Bechtel* that this Court believes expert testimony is necessary to counter common misconceptions about BWS does not impose a duty on counsel to override his/her client's informed decisions on what tactics to take in any given case. Further, the State argues the evidence showed counsel's performance was not outside the wide range of reasonably professional conduct as counsel recognized the possibility of presenting a BWS defense, discussed the defense with his client, contacted potential experts and obtained estimates for their fees, and presented all of this information to the defendant who then made the decision to forego the defense.

¶ 19 The record reflects that nine (9) witnesses testified at the evidentiary hearing. Jeri Fritz, Ph.D., licensed clinical psychologist, testified she believed Appellant suffered from BWS during her marriage to the victim, that had he been called to testify he could

have arranged his schedule so as to accommodate the court and would have testified to the dynamics of BWS, including the effects of the syndrome on Appellant's perceptions, and he would have been able to dispel commonly held myths regarding the syndrome. His testimony was consistent with the statements in his affidavit.

¶ 20 Of the remaining witnesses, we focus on the testimony of Appellant; her daughter, Jessica Edwards; and defense counsel Park Medearis as it relates to the BWS defense. Essentially Appellant testified that her daughter accompanied her to all meetings with counsel and the subject of using BWS as a defense was discussed frequently. Appellant understood counsel to say that she and her daughter were responsible for finding an expert on the defense. Appellant said that prior to trial she saw a letter in counsel's office that an expert would be available for $6,000. Appellant said she told counsel she did not have that much money, but at no time did she tell counsel to give up on the BWS defense. Appellant also testified counsel did not inform her she could file an application with the court to see if she was eligible to have the court fund pay for the expert witness.

¶ 21 Appellant's daughter, Jessica Edwards, testified she had witnessed her stepfather, the victim, verbally and physically abuse her mother for years. She said she tried to get her mother to leave the victim, but she refused saying he would only come and get her and then it would be worse. Ms. Edwards corroborated her mother's statements concerning their visits with defense counsel and the discussions concerning BWS. Ms. Edwards also understood counsel to say it was up to her and Appellant to find and hire an expert on BWS. She said counsel did not tell her what qualifications to look for in an expert, did not give her any names of potential experts, and did not tell her where she might find such experts. Ms. Edwards said she and Appellant did not have much money to spend on the case and she did not

know they could petition the court for funds to hire the expert.

¶ 22 Defense counsel Park Medearis testified he met with Appellant and her daughter many times concerning the case and from what they told him, he understood there was a history of domestic violence and spousal abuse. He said Ms. Edwards concurred with her mother's story of abuse but in his opinion she did not have much personal knowledge or direct observations of the abuse. Mr. Medearis denied telling Appellant and Edwards they were responsible for finding an expert, stating: "I don't think I put them to that task, but certainly encouraged them. If they felt they could find someone to please do." He said he didn't think he specified what type of expert adding, "but certainly common sense would dictate that you get someone who's familiar with the syndrome and would have the expertise to be able to evaluate and form a conclusion." [4]

¶ 23 Mr. Medearis testified a fellow attorney recommended an expert to him but when he contacted the expert; he was told the expert could not work on the case. However, that expert recommended three others. Medearis said he wrote to one of the recommended experts and received a response which listed the expert's qualifications and a retainer of $2,000. Medearis said when he gave this information to Appellant; she said she did not want to spend the money. However, he could not remember if Appellant said she did not have the money or she just did not want to pursue a BWS defense because of the expense.

¶ 24 Mr. Medearis repeatedly testified that Appellant told him that based upon the State's case she was going to be convicted anyway and it wouldn't help to use an expert. He said he tried to explain "from day one that [BWS] was the principle defense [he] was hoping to advocate, but it appeared to me to be a decision that she had made." [5] He said that while he didn't agree with it, and would have liked to have the expert, "she was my boss and so I did what she said to do." [6]

---

4. Tr. Evid.Hrg., Vol. II, pg. 46.

5. Tr. Evid. Hrg., Vol. II, pg. 61.

6. *Id.*

¶ 25 With respect to the cost of the expert, he said there was no consideration given to applying to the court fund for money to pay the expert. Medearis explained he did not consider it because Appellant was not indigent. He stated in part, "the fact that she had me pursuing experts led me to believe that she had the financial wherewithal to pay for one or she wouldn't be having me look." Although he did not know exactly what Appellant's financial condition was, he testified "she seemed fine financially". Medearis said he knew the history of the case, the money Appellant had been able to raise and believed that Appellant just chose not to spend it on an expert.

¶ 26 When asked to describe Appellant, Mr. Medearis testified:

She became very, very, very sad, kind of gloomy and withdrawn and seemed to become more and more convinced that she was going to be convicted no matter what. And, you know, she had made repeated statements that she felt like she was going to lose anyway and didn't think an expert on battered woman would do any good. So based upon that affirmation—repeated affirmation—I didn't pursue it any further.[7]

¶ 27 Mr. Medearis said Appellant affirmatively instructed him not to pursue BWS "when she said she was convinced that she was going to lose her case and that it wasn't going to help. And that, to me, was instruction enough not to pursue it any further." [8] When asked if he disagreed with her, Medearis said he wouldn't have pursued BWS if he didn't think it had merit, but Appellant "realized we weren't going to be able to have an expert if she wasn't willing to pay for one." [9] Medearis testified he "was following the directions of my client" in not pursuing a syndrome defense. On cross-examination, Medearis repeatedly stated it was not his choice to abandon the syndrome defense, it was Appellant's choice.

¶ 28 Under questioning from the court regarding how forceful he was in explaining to Appellant how critical it was to have an expert testify in her case, Medearis testified:

Well, I told her essentially that the Battered Women's Syndrome would assist in explaining to the jury how she reacted the way that they (sic) did. And that—and that under that, it—it might be entirely consistent for her—for her to have acted the way in which she did. I don't know that I got into the microscopic scientific details of the Battered Women's Syndrome, but she seemed to know more about it than I did in terms of its application and what it was and that sort of thing. But I mean, I'm professionally satisfied that she knew what it was and how it worked and how significant it was to the defense of the case.[10]

¶ 29 When asked by the court if he had any idea "that her general feelings of hopelessness and inevitability of conviction might have in itself been symptomatic of a battered woman," Mr. Medearis replied, "no, I didn't". He said the "pendulum, so to speak, would swing back and forth", and Appellant would be gloomy and worried she'd be convicted one day and the next day she felt she had a good defense and felt like the jury would believe her. When asked if he believed an expert was critical to the defense, Medearis replied:

Well, I don't know that it was—that it was critical or not because I don't—I mean, at the time, I didn't know if she actually suffered from the Battered Women's Syndrome. If she didn't have it, I mean, we wouldn't have known. But, you know, from my perspective, the only way she would have been able to get an expert on that basis, if she wasn't willing to expend her own money, would be to make application for indigent status and have the court fund pay for that and I didn't think there was any way that she would ever have qualified for indigent status in light of her financial situation, the fact she made bond,

---

7. Tr. Evid. Hrg., Vol. II, pg. 64.

8. Tr. Evid. Hrg., Vol. II, pg. 65.

9. Id.

10. Tr. Evid. Hrg., Vol. II, pg. 91.

hired an attorney, that sort of thing.[11]

¶ 30 The court then asked if Medearis did anything to memorialize his advice to Appellant and the fact that she declined his advice to hire an expert. Mr. Medearis said he had not written down or documented things of that nature.

¶ 31 After hearing testimony and argument, the court issued its findings which are consistent with the findings of facts submitted to this Court. The judge said the witnesses and evidence named in the application are available and would be available at a new trial of the matter and that their testimony would be consistent with the statements contained in their affidavits. As for BWS defense, the judge said:

> ... the facts in this case are such that had the BWS testimony been offered at trial, it would have been admitted.... And had that testimony been presented to the jury, I think there is a rather high likelihood that it could have affected the jurors decisions in the outcome of the trial. I really don't think that the decision not to use the BWS was a conscious trial strategy. I think it was a situation where Ms. Smith probably didn't quite understand the significance of that defense and how critical it was ... So, his decision was driven I think not by strategy but by I guess probably by, I would say, by the lack of his ability to impress upon Ms. Smith the critical nature of that testimony. I think all the other issues that we've discussed—the lack of visitation to the crime scene,—well, I won't go into all of it, but those are all secondary issues. But as far as the failure to present an expert witness on BWS I believe that the defense counsel was ineffective and I will recommend to the Court of Criminal Appeals that Ms. Smith get a new trial ...[12]

¶ 32 On appellate review, this Court will give the trial court's findings strong def-

erence if supported by the record, but we shall determine the ultimate issue of whether trial counsel was ineffective. Rule 3.11(B)(3)(b)(iv), *Rules of the Court of Criminal Appeals,* Title 22, Ch.18, App. (2001). *See also Patterson v. State,* 2002 OK CR 18, ¶ 19, 45 P.3d 925, 930; *Jackson v. State,* 2001 OK CR 37, ¶ 23, 41 P.3d 395, 400; *Glossip v. State,* 2001 OK CR 21, ¶ 20, 29 P.3d 597, 602. After careful review and consideration of the record, we find the trial court's findings and conclusions are supported by the record.[13]

¶ 33 Addressing first the trial court's conclusions of law, *Bechtel* and *Paine* clearly indicate that when a battered woman presents a defense of self-defense at trial, defense counsel should present the testimony of an expert on BWS in order "to equip the jury to properly assess the reasonableness of [the defendant's] fear." *Paine,* 339 F.3d at 1204. While the use of an expert is not mandatory, each case will be reviewed on the facts of the case to determine if an expert should have been used. Further, when evidence of BWS is introduced into a trial, at the close of evidence the jury is to be instructed pursuant to Oklahoma Uniform Jury Instructions—Criminal (2d) 8–47.

¶ 34 Contrary to the State's claim, this requirement does not impose upon attorneys a duty to override their client's informed decisions on what tactics to take in any given case. The problem in this case was that Appellant's decisions regarding the BWS expert were not informed decisions and counsel failed to meet his professional obligation of providing his client with sufficient information in order to allow her to make a knowing and informed decision.

¶ 35 We review claims of ineffective assistance of counsel under the well established rule of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) which sets forth a two-part test which must be applied to determine whether a defendant

11. Tr. Evid. Hrg., Vol. II, pg. 93.

12. Tr. Evid. Hrg., Vol. II, pg. 123.

13. Judge Shepherd conducted the evidentiary hearing and presided over Appellant's trial. Therefore, he was in the best position to assess how the omitted evidence might have affected the outcome of the trial. We commend Judge Shepherd for his thorough analysis of the evidence presented at the evidentiary hearing and the applicable law. The district court's diligent resolution of this matter on remand has been of great assistance to this Court.

has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064. *See also Bland v. State*, 2000 OK CR 11, ¶ 112, 4 P.3d 702, 730–731. The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. *Id.*, 466 U.S. at 695, 104 S.Ct. at 2068. This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Bland*, 2000 OK CR 11, at ¶ 112, 4 P.3d at 730–731.

¶ 36 The Oklahoma rules of Professional Conduct govern attorney conduct in this state. These rules do not lay the groundwork for claims of ineffectiveness, but they are pertinent to any discussion of attorney conduct when the rules touch on subjects raised in a claim of ineffectiveness. *See Jackson*, 2001 OK CR 37, at ¶ 24, 41 P.3d at 400. The rules provide that a lawyer shall abide by a client's decisions concerning the objectives of representations. Rule 1.2, *Rules of Professional Conduct*, 5 O.S.2001, Ch. 1, App. 3–A. "In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." *Id.* "Both lawyer and client have authority and responsibility in the objectives and means of representation." *Comments to* Rule 1.2, *Rules of Professional Conduct*, 5 O.S.2001, Ch. 1, App. 3–A. "In questions of means, the lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expenses to be incurred." *Id.*

¶ 37 Also, "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.4(b), *Rules of Professional Conduct*, 5 O.S.2001, Ch. 1, App. 3–A. "The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so." *Comments to* Rule 1.4, *Rules of Professional Conduct*, 5 O.S.2001, Ch. 1, App. 3–A.

¶ 38 The testimony given at the evidentiary hearing was contradictory as to why a BWS defense was not pursued. There was no contemporaneous written communication to the client regarding the defense, requirements both financially and legally to present it or the benefit it would provide in the presentation of Appellant's case. Thus, this Court is limited to the testimony from the evidentiary hearing in reviewing the appropriateness of the actions taken. However, the record clearly supports the trial court's finding that defense counsel failed to adequately impress upon Appellant the necessity for an expert in her case. While counsel was correct in his statements that Appellant was his "boss", as the client is basically in charge of his/her case, he seemed to have used this as an excuse not to fully exercise the professional responsibilities due Appellant. Counsel's statements that Appellant seemed to know more about BWS "and how it worked" than he did is a clear abdication of his duty to provide competent representation. While we do not know the educational level of Appellant and her daughter, we do know they were not attorneys versed in the law. Defense counsel was. The failure to pursue a potentially viable legal defense on the grounds that the layperson client knew more about the legal defense than counsel was unreasonable and constituted deficient performance. While counsel may have felt he did not know enough about the defense, it was his duty to educate himself or associate with a lawyer more familiar with the issue. Counsel's failure to appropriately educate himself on the issue is glaringly apparent in his failure to recognize that Appellant's mood swings and feelings of hopelessness and inevitability of conviction might be an indicator of the syndrome, thereby making it even more imperative that she at least be evaluated by an expert.

¶ 39 Further, counsel's failure to petition the court for funds to pay an expert was not an exercise of reasonable professional judgment. While counsel's reasons for not petitioning the court might be sufficient in another case, here it impacted the only potentially viable defense and the record reveals Appellant was not made aware of that option. It would not have been an inordinate use of time and effort by counsel to prepare a petition or for the court to review such petition and make a record of its findings. As the evidence strongly supported the evaluation of Appellant by a BWS expert to determine if the syndrome was in fact a viable defense, and as Appellant was clearly concerned with finances and indicated she could not or would not pay for such an expert, a reasonable exercise of counsel's professional judgment would have been to petition the court for funds to pay an expert and ensure that the court's ruling was on the record. If counsel had fully informed Appellant, and a contemporaneous memorandum of that advice was available for the trial court and this Court, the result might be different.

¶ 40 When a lawyer is hired to represent a client in a criminal proceeding, that lawyer does not "own" the case. *Grant v. State*, 2004 OK CR 24, 95 P.3d 178, 182 (Lumpkin, J., special concur). While counsel has the responsibility to advise, inform, and consult with the client, the defendant has the right be involved in the decision process that will affect his or her life. *Id. See also Lott v. State*, 2004 OK CR 27, ¶ 164, 98 P.3d 318, 357 citing *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

¶ 41 In the present case, the record indicates Appellant was involved only to a certain extent in making decisions about her defense. However, the record also indicates her decisions, particularly concerning the pursuit of the BWS defense, were made as a result of being less than fully informed of the pertinent facts and circumstances. A fully and properly informed client is bound by his/her decisions regarding their case. However, the problem in the present case is that Appellant was not fully informed about the BWS defense and there is nothing in the record showing counsel confirmed with Appellant his decision not to hire an expert and not to present that defense. A letter in either counsel's file or the court file is preferable to oral advice.

¶ 42 Counsel's failure to fully and accurately inform Appellant about the parameters of the BWS defense and its application to her case is professionally unreasonable. Under the facts of this case, counsel was deficient in not ensuring that Appellant was evaluated by an appropriate expert in order to determine the viability of that defense at trial. His decision to forego the hiring of an expert was not part of any reasonable trial strategy or professional deference to the client.

¶ 43 This case stands in sharp contrast to *Lockett v. State*, 2002 OK CR 30, ¶ 18, 53 P.3d 418, 425, where the appellant complained that trial counsel was ineffective for failing to marshal and direct the evidence of his mental illness into a coherent defensive strategy. In that case, this Court found no showing of deficient performance as the record showed that defense counsel explored the possibility of presenting an insanity defense but declined to do so when the statements and examination of his doctors and expert witnesses failed to support this defense. *Id.* In the present case, beyond contacting an expert and receiving information about her qualifications and fee, counsel did not pursue the issue further.

¶ 44 Further, this case should not be confused with cases where the defendant makes an unequivocal request of counsel to pursue or abandon a certain defense. Here, the testimony was contradictory as to whether Appellant told defense counsel to abandon a BWS defense. *See Grant v. State*, 2004 OK CR 24, ¶ 12, 95 P.3d 178, 181 (counsel's decision to follow defendant's unequivocal request not to contact his family members was reasonable).

¶ 45 Having satisfied one prong of *Strickland,* we look to see if Appellant was prejudiced by this deficient performance. Without the BWS defense, and proceeding under a "generalized self-defense", Appellant was convicted of the lesser offense of second degree murder. However, if the testimony of a qualified expert was presented to the jury, Appellant might have been acquitted. This

clearly establishes a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.

¶ 46 Therefore, Appellant's conviction should be reversed and this case remanded to the district court for a new trial. Upon retrial, based on the record presented, if Appellant insists on presenting a defense of self defense utilizing the Battered Woman Syndrome, she should be evaluated by an appropriate expert. If the expert finds Appellant suffers from the syndrome, that expert witness should be called to testify at trial. However, the decision as to who is responsible for and how the expert should be compensated is a decision the District Court must make.

¶ 47 While Appellant's other claims of trial counsel unpreparedness also cause us some concern, in light of the above discussion and the need to remand the case for a new trial, it is not necessary to address those issues further.

¶ 48 Appellant's second proposition claiming regarding violations of due process and equal protection due to gender based exclusion of female jurors is rendered moot due to the need to reverse and remand this case for a new trial. *See Pinkley v. State,* 2002 OK CR 26, ¶ 13, 49 P.3d 756, 760 n. 16 (allegations of prosecutorial misconduct and ineffective assistance of counsel rendered moot upon reversal of case and remand for new trial).

### DECISION

¶ 49 The Judgment and Sentence is **REVERSED FOR A NEW TRIAL.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

CHAPEL, P.J., A. JOHNSON, J. and LEWIS, J.: concur.

C. JOHNSON, J.: specially concur.

C. JOHNSON, J., Specially Concurring.

¶ 1 I concur in the Court's decision to reverse this case for a new trial. I write separately to comment on some of the ethical challenges that cases such as this one present to defense counsel. Though not binding, American Bar Association (A.B.A.) standards have been considered by the Supreme Court to be guides in the determination of effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Under A.B.A. standards, "[d]efense counsel should consider all procedural steps which in good faith may be taken, including ... obtaining psychiatric examination of the accused when a need appears." ABA CRIMINAL JUSTICE STANDARDS R. 4–3.6 (1991). Also, counsel "should explain developments in the case to the extent necessary to permit the client to make informed decisions regarding the representation." ABA CRIMINAL JUSTICE STANDARDS R. 4–3.8 (1991). If counsel believes that particular investigative or expert services are critical to a successful defense, but the client cannot or will not provide funds to pursue that defense, then counsel should or in my opinion *must* make a record on that issue. ABA CRIMINAL JUSTICE STANDARDS R. 4–5.2 (1991). However, if the problem involves the financial inability to hire experts that are significant to preparing an adequate defense, the State is required to provide the necessary funds. *Ake v. Oklahoma,* 470 U.S. 68, 74, 105 S.Ct. 1087, 1092, 84 L.E.2d 53 (1985); 20 O.S. Supp.2002, § 1304(B)(19). Counsel should also make a proper record of such request and what the State did with same.

¶ 2 An effective counsel violation can result from the defense counsel's failure to explore or present an established defense. *Galloway v. State,* 1985 OK CR 42, ¶ 14, 698 P.2d 940, 942 (holding that when defense counsel does not present evidence to support an applicable insanity defense, the defendant was denied effective assistance of counsel). The Battered Woman Syndrome is such a defense, and expert testimony is often essential to explaining the reasonableness of the defendant's conduct. *Bechtel v. State,* 1992 OK CR 55, ¶ 26–28, 840 P.2d 1, 10; OUJI–CR (2d) No. 8–47. Here, to ensure an "informed decision," counsel had a duty to sufficiently explain to his client the potential impact and significance of the Battered Woman Syn-

drome to the outcome of her case. Counsel should have made his client aware of the potential availability of funds through the State and emphasized the importance of obtaining such expert assistance to her defense.