2007 OK CR 14

**Isidro MARQUEZ–BURROLA, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2003–1140.**

Court of Criminal Appeals of Oklahoma.

April 17, 2007.

13. Art. 4, § 1, Okla. Const.

Michael Arnett, Norman Hollingsworth, Oklahoma City, OK, attorneys for defendant at trial.

Bret Burns, Jason Glidewell, Assistant District Attorneys, Chickasha, OK, attorneys for the State at trial.

Michael D. Morehead, Sandra Mulhair Cinnamon, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, attorneys for the State on appeal.

## OPINION

C. JOHNSON, Vice Presiding Judge.

¶ 1 Appellant, Isidro Marquez–Burrola, was charged in the District Court of Grady County, Case No. CF–2002–45, with First Degree Murder (21 O.S.2001, § 701.7(A)). The State alleged two aggravating circumstances in support of the death penalty: (1) that the murder was especially heinous, atrocious, or cruel; and (2) that there existed a reasonable probability that Appellant would constitute a continuing threat to society. Jury trial was held February 3–6, 2003, before the Honorable Richard G. Van Dyck, District Judge. The jury found Appellant

guilty as charged, found the existence of both aggravating circumstances, and recommended a sentence of death. The district court formally sentenced Appellant on October 20, 2003.

## FACTS

¶ 2 On February 13, 2002, Appellant killed his wife, Enriqueta, by cutting her throat with a knife. The couple had been married some seventeen years, and had three children, two of them teenagers. Appellant and his wife had grown up in the same small town in Mexico. In 1997 they moved to Oklahoma, where one of Appellant's brothers lived. At the time of the homicide, Appellant remained a citizen of Mexico, but was working for a company in Edmond, Oklahoma, installing sprinkler systems.

¶ 3 The State presented evidence of Appellant's jealousy and distrust of his wife. The couple's teenage children, and other witnesses, testified to instances of Appellant's aggression and occasional violence toward Enriqueta. Appellant accused Enriqueta of having extramarital affairs. A few days before the homicide, Appellant assaulted a co-worker, Joselito Rodriguez, with a piece of PVC sprinkler-system pipe, allegedly because Rodriguez claimed to have slept with Appellant's wife. During this period of time, Enriqueta moved in with her brother, Jose Marquez, and his girlfriend, Alicia Nunez–Ortaga. She told her brother that she planned to leave Appellant because he was too jealous and violent.

¶ 4 The day before the homicide, Appellant's brother, Julian, was concerned about Appellant's well-being and took him to see a "brujo," or Mexican spiritual counselor. Appellant told the counselor about his problems, prayed with the counselor, and promised to come back at a later date. Although Appellant routinely drove a company truck and carried a company cell phone while at work, on the day before the homicide, he left the truck and phone at a job site.

¶ 5 On the morning of the homicide, Appellant called his employer, explained that he was having marital troubles and had some things to take care of, and said that he would

be back to work after that. Appellant's son, Isidro Jr., testified that Appellant drove him to school that morning; when the son asked if Appellant would pick him up after school, Appellant said he would, but "looked the other way as if he was sad or something." Later that morning, Appellant called his wife and arranged to visit her at her brother's home, ostensibly to talk about the children. When Appellant arrived, Enriqueta spoke briefly with him outside; she told her brother's girlfriend that they were going to visit a counselor and that she would call soon.

¶ 6 A short time later that day, a truck driver saw Appellant driving along the highway with a blood-soaked body in the passenger seat of his car, and notified the police. Appellant's vehicle was stopped by the Oklahoma Highway Patrol. Enriqueta's body lay in the front passenger seat. The trooper testified that it did not appear she had been dead for very long. Appellant was arrested without incident. A blood-stained filet knife was found between the front seats of the car.

¶ 7 An autopsy revealed that Enriqueta suffered four separate cuts to her neck, one of which cut through approximately eighty percent of her neck, severing her esophagus, trachea, and venous structures, but leaving the main artery intact. The autopsy also revealed several defensive knife cuts to Enriqueta's hands, one of which almost severed a finger. The medical examiner testified that Enriqueta could have remained conscious for several minutes after the fatal injury, as blood continued to flow to her brain and she was still able to breathe, albeit through the opening in her neck rather than through her mouth or nose. The blood leaving her brain drained out of her severed veins and seeped into her lungs. The medical examiner concluded that Enriqueta not only bled to death, but drowned in her own blood in the process. The number of cuts to the neck, the frothing around the wound caused by aspirated blood, and the defensive wounds on Enriqueta's hands, all led the medical examiner to conclude that Enriqueta's death was neither instantaneous nor painless.

¶ 8 The defense claimed that Appellant killed his wife in a heat of passion. Appel-

lant told police that while driving with his wife that morning, she admitted to a number of affairs with other men and insulted his masculinity. Appellant said he was enraged by these statements and used a large knife, which he kept in the glove box, to cut his wife's throat. The defense also presented psychiatric testimony showing that since the homicide, Appellant had reported delusions of seeing his wife and hearing her speak to him in his jail cell. Appellant himself testified that he knew he had killed his wife, but that he did not believe she was really dead.

¶ 9 In the punishment stage of trial, the State relied on the medical examiner's testimony in the guilt stage to show that Enriqueta's death was especially heinous, atrocious, or cruel. As for its allegation that Appellant posed a continuing threat to society, the State referred to guilt-stage evidence that Appellant had assaulted a co-worker, to Appellant's prior instances of verbal and physical abuse toward his wife, and to the circumstances of the murder itself. The State also presented evidence that Appellant had incidents of combative behavior since he had been in jail, and that shortly after his arrest, he had tried to escape. The State presented no victim impact testimony. In mitigation, the defense presented three witnesses: Appellant's father, mother, and sister. Each testified generally that Appellant had been a good man in the past and asked the jury to spare his life. The entire mitigation case comprised less than fifteen pages of transcript.

## DISCUSSION

### A. COMPETENCY TO STAND TRIAL

¶ 10 In Proposition 1, Appellant alleges that he has been subjected to criminal proceedings while incompetent to assist in his own defense, in violation of his right to due process of law as guaranteed by the United States and Oklahoma constitutions. He claims that he was denied procedural due process relating to the issue of competency before trial, that he was denied substantive due process by being forced to go to trial while incompetent, and that trial counsel was ineffective for failing to adequately advance the competency issue below. A summary of the relevant proceedings is helpful.

¶ 11 The day after his arrest in mid-February 2002, Appellant was formally charged with First Degree Murder. Counsel and an interpreter were appointed at State expense. In late March 2002, appointed counsel filed an Application for Determination of Competency, and the trial court committed Appellant to Eastern State Hospital for evaluation. On April 9, 2002, the district court received a report from hospital officials concluding that Appellant was competent to stand trial. Meanwhile, Appellant's family raised enough money to retain counsel for Appellant, who formally entered the case on April 12. On April 25, 2002, retained counsel filed an Application for Expert Services at State Expense, asserting that while Appellant's family had pooled resources to hire counsel, they did not have funds to retain "a private investigator, an interpreter, or a psychiatrist." The State filed a written objection, and at a hearing in May 2002, the district court denied the request.

¶ 12 A post-examination competency hearing was held May 30, 2002. Appellant, through counsel, waived his right to have a jury determine his competency. Testimony was received from Dr. Samina Christopher, the psychologist who evaluated Appellant at Eastern State Hospital; from the officer that arrested Appellant for the charged crime; and from Appellant himself. Dr. Christopher testified that in her opinion, Appellant was competent to understand the proceedings against him, even though he reported having hallucinatory experiences where his wife would come to visit with him. Dr. Christopher felt that these experiences were not atypical for persons in Appellant's situation, and might be a normal part of his bereavement process. Appellant testified that he knew he had killed his wife, but maintained that she came to his cell to speak with him. Appellant understood that the court was to make the final decision as to his competency, but said he was ready for his attorneys to stop toying with him and let him go home to his wife and family. The arresting officer testified that Appellant had been able to recount details of how and why he

killed his wife at the time of his arrest. The trial court found Appellant competent, based on Dr. Christopher's conclusions and the court's own observations.

¶ 13 Between the competency hearing in May 2002 and the trial in February 2003, defense counsel sought and received funds from the trial court to hire an investigator and a psychiatrist in preparation for trial. Dr. Montero, retained by the defense, evaluated Appellant in October 2002. In November 2002, at the State's own request, Appellant was evaluated again at Eastern State Hospital, by Dr. Terese Hall. After reviewing the prior evaluations in conjunction with their own, both experts found Appellant to be presently competent. Both Dr. Montero and Dr. Hall testified at trial. After the jury's verdict, defense counsel moved for a new trial, and alternatively asked the court to stay formal sentencing and empanel a jury to determine whether Appellant was competent to be sentenced. These requests were due in large part to Dr. Montero's reversal of his opinion about Appellant's competency after personally observing Appellant during the trial. Appellant was again evaluated by Dr. Hall, and a further competency hearing was held, but the trial court ultimately found no new reason to doubt Appellant's competency.

¶ 14 With these facts in mind, we turn to Appellant's claims that the trial-level competency proceedings denied him both substantive and procedural due process. Appellant claims (1) that the trial court erred in finding that he was not indigent for purposes of the post-examination competency hearing and refusing to provide funds for a defense expert on the issue at that time; (2) that trial counsel was ineffective for not challenging the court's denial of funds for that purpose; (3) that Appellant was denied his right to expert assistance for the competency hearing; (4) that the court erred in finding Appellant competent to stand trial; (5) that Appellant was, in fact, incompetent to stand trial, and defense counsel was ineffective for not challenging Appellant's competency during the trial itself; (6) that the trial court erred in finding Appellant competent to be sentenced; and (7) that Appellant is presently incompetent to assist in his appeal.

■ ¶ 15 The first three sub-arguments depend on Appellant's assumption that, if he had been found indigent, he was constitutionally entitled to state funds to conduct the very same inquiry that was made under Oklahoma's statutory competency-evaluation procedure (22 O.S. §§ 1175.1 *et seq.*).[1] In support of these assertions, Appellant relies on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), which held that "[w]hen the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense . . . the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 82–83, 105 S.Ct. at 1096. We are, however, unaware of any case law which reads *Ake* to require what Appellant claims it does. Indeed, in *Ake* the Supreme Court cautioned that "access to a competent psychiatrist who will conduct an appropriate examination" does not necessarily require that the defendant be given the right to "choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id.* at

---

1. Oklahoma's statutory competency-evaluation scheme may be summarized as follows. The question of competency may be raised by the prosecutor, the defendant, defense counsel, or by the court *sua sponte*. Upon the filing of an application for determination of competency, the court shall hold a hearing to examine the application and determine if sufficient facts are alleged to create a doubt about the defendant's competency. If the court finds such a doubt, the defendant is ordered to be examined by appropriate professionals. These professionals then submit a report, answering five questions: whether the defendant is able to understand the nature of the charges; whether he is able to assist his counsel; whether the defendant, if found incompetent, could regain competency at some reasonable time in the future; whether the defendant is mentally ill or in need of treatment as those terms are defined by law; and whether the defendant, if released, would likely pose a significant threat to himself or others. Once this report is submitted, a post-examination competency hearing is held; at the hearing, evidence regarding competency is presented, and the judge, or jury if requested by the defense, decides whether the defendant is competent to stand trial. *See* 22 O.S. §§ 1175.1 *et seq.; Allen v. Oklahoma*, 1998 OK CR 25, ¶¶ 2–4, 956 P.2d 918, 919.

83, 105 S.Ct. at 1096. *See also Brown v. State,* 1987 OK CR 181, ¶ 15, 743 P.2d 133, 137 (an indigent defendant claiming a need for expert assistance "is not entitled to public funds to 'shop around' until he finds a 'hired gun' with a favorable opinion").[2] Under Oklahoma's competency evaluation procedure, doubts as to competency may be raised by either party or by the court itself; the experts called upon to assess the defendant's competency are experts appointed by the court, not agents of the prosecution. The Supreme Court has held that state-created competency evaluation schemes such as Oklahoma's satisfy due process concerns related to the competency of an accused to stand trial. *See Drope v. Missouri,* 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). We find that Oklahoma's statutory competency evaluation scheme satisfied Appellant's procedural due process concerns in this case.

¶ 16 In any event, defense counsel *did* ultimately request and receive court funds to hire his own psychiatrist. Dr. Montero was retained to explore mental health issues, including but not limited to competency, in anticipation of trial. Thus, even if *Ake* did require that a psychiatric expert of the indigent defendant's own choosing be appointed to conduct a *second* competency evaluation after state law had already provided one, we find that Appellant was provided such an expert. *See Walker v. Attorney General,* 167 F.3d 1339, 1348 (10th Cir.1999) (*Ake* errors are subject to harmless-error analysis). A claim of ineffective assistance of counsel requires the defendant to show not only that counsel's performance was professionally unreasonable, but that the performance actually prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Because Oklahoma

law had already provided Appellant with a constitutionally acceptable competency evaluation procedure at no charge, and because defense counsel was later provided funds to hire a psychiatrist who similarly concluded, before trial, that Appellant was competent, Appellant can show no prejudice resulting from the trial court's initial failure to fund a psychiatric defense expert.[3]

¶ 17 We now turn to whether the record supports the trial court's conclusion that Appellant was competent to stand trial. We give substantial deference to the trial court's conclusion on this issue. *See Short v. State,* 1999 OK CR 15, ¶ 9, 980 P.2d 1081, 1090–91. A judicial determination of competency requires more than reading clinical reports. It involves assessing the knowledge and credibility of relevant expert witnesses, assessing the observations of lay witnesses, and personally observing the defendant's demeanor—all of which juries and trial judges, charged with determining competency, are better-equipped to handle than we are. At the post-examination hearing, the trial court found Appellant competent based on Dr. Christopher's evaluation, lay testimony (including Appellant's), and on the court's own observations of Appellant in prior proceedings. The court recognized that Appellant exhibited some strange ideation, but deferred to the expert's conclusion that such behavior was not all that unusual for someone in Appellant's situation. The record supports the trial court's determination of competency, based on the information available to it at that time.

¶ 18 Furthermore, Appellant was re-evaluated twice shortly before trial. Dr. Montero evaluated Appellant in October 2002. He reviewed Dr. Christopher's initial evaluation

---

**2.** *Accord Dirickson v. State,* 329 Ark. 572, 953 S.W.2d 55, 57 (1997) ("Stated simply, the State is not required to pay for a defendant to shop from doctor to doctor until he finds one who will declare him incompetent to proceed with his trial.... In the present case, appellant was examined at the state hospital, and, thus, the requirements under *Ake* were satisfied").

**3.** *See also Allen v. Mullin,* 368 F.3d 1220 (10th Cir.2004) (no *Ake* error with regard to expert assistance on competency, where trial court appointed several experts at defense counsel's re-

quest after the defendant had already been evaluated pursuant to Oklahoma's competency-evaluation statutes, and the defense expert specifically charged with assessing the defendant's competency subsequently agreed with the initial finding of competency); *cf. Wallace v. State,* 1997 OK CR 18, ¶ 11 & n. 3, 935 P.2d 366, 370–71 & n. 3 (any error in failure to appoint defense expert at a particular point in the proceedings was harmless, where such expert was appointed at a later time).

from six months before and agreed that Appellant presently met the criteria for competency to stand trial. Dr. Hall, from Eastern State Hospital, who evaluated Appellant in late November 2002, agreed with these two previous evaluations and commented that while Appellant still reported intermittent experiences of seeing and hearing his wife, he admitted that he had killed her out of anger and jealousy. Thus, the information available at the time of trial, from several experts, including one chosen by Appellant, gave neither defense counsel nor the court any material reason to believe that Appellant's competency was suddenly in doubt. We therefore reject Appellant's claim that trial counsel was ineffective for failing to challenge his competency during the trial itself. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

¶ 19 Without doubt, the record contains evidence that raises questions about Appellant's mental health. We are particularly troubled by the fact that Appellant rejected several offers to plead guilty in exchange for a sentence of life without parole. At a hearing held in January 2003, just a few weeks before trial, the State made its final offer; Appellant, speaking through an interpreter, politely declined it, admitting he had made "errors" but maintaining his innocence, asking for forgiveness, and requesting that he be allowed to return home to his wife and children. Other portions of the record indicate that Appellant still exhibits some delusional behavior.[4] But as we have noted, the trial court had a substantial basis for concluding that Appellant was competent at the time of trial. We need not evaluate Appellant's claim regarding his competency to be sentenced, as we find it necessary to modify Appellant's sentence (see discussion of Proposition 2 below). To the extent Proposition 1 challenges the procedural framework and evidentiary basis for finding Appellant competent to stand trial, it is denied.[5]

## B. SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONVICTION

¶ 20 In Proposition 3, Appellant contends that the evidence presented at trial was insufficient to sustain a conviction for First Degree Murder. He claims that, but for instructional errors and the prosecutor's misstatements about the applicable law, the jury would have convicted him of First Degree Manslaughter. We disagree.

¶ 21 The State charged Appellant with premeditated murder, alleging that he cut his wife's throat with the specific intent to kill her. Appellant did not deny that he killed his wife, but claimed that he acted in a heat of passion, without premeditation. The trial court used the Uniform Jury Instructions relevant to both First Degree (Premeditated) Murder and First Degree (Heat of Passion) Manslaughter. Appellant now claims that when a lesser related offense is actively pursued as an "affirmative defense," the State's burden of proof is transformed. Appellant claims that before the jury could find him guilty of premeditated murder, it was required, under specific instructions, to first find that the State had disproved his heat-of-passion theory beyond a reasonable doubt. We have previously considered and rejected Appellant's characterization of the law on this issue. Specifically in the context of premeditated murder and heat-of-passion manslaughter, we have held that the Uniform Instructions relevant to these two offenses, when considered in conjunction with one another, correctly state the law as to both. *Hogan v. State,* 2006 OK CR 19, ¶¶ 37–44, 139 P.3d 907, 922–925; *Black v. State,* 2001 OK CR 5, ¶¶ 44–48, 21 P.3d 1047, 1065–67; *McCormick v. State,* 1993 OK CR 6, ¶¶ 18–28, 845 P.2d 896, 899–901. We continue to adhere to that position.

¶ 22 Appellant also complains that the prosecutor misstated the law applicable to his defense, and the facts in support of that defense. Appellant claimed at trial that he

---

4. During one post-trial interview, Appellant reported that he had not "seen" his wife since before his trial. However, he claimed that she still talked to him through the jail intercom system.

5. We reject Appellant's claim that his alleged current incompetency necessarily affects the validity of these appellate proceedings. *Fisher v. State,* 1992 OK CR 79, ¶¶ 16–17, 845 P.2d 1272, 1277.

killed his wife in an uncontrollable rage after she made a surprise admission of marital infidelity and insulted his masculinity. The prosecutor reminded the jury that insulting words alone could not justify a homicide. This was an entirely correct statement of the law. OUJI–CR (2nd) No. 4–98; *Washington v. State*, 1999 OK CR 22, ¶ 13 & n. 4, 989 P.2d 960, 968 & n. 4.[6] The prosecutor's characterization of Appellant's defense as "dishonorable," "cowardly," and even "dishonest" were all reasonable inferences based on the evidence. Appellant himself placed "honor" in issue by claiming that an insult to his masculinity was particularly egregious because of his Hispanic heritage. The prosecutor was also free to cast doubt on the "honesty" of Appellant's defense by pointing to evidence that Appellant had, among other things, placed a filet knife in his car before the killing. *Turrentine v. State*, 1998 OK CR 33, ¶ 63, 965 P.2d 955, 974–75.

■■■ ¶ 23 Finally, we turn to whether the evidence was sufficient to support Appellant's conviction. In doing so, we must consider the totality of evidence presented to the jury in a light most favorable to the State. *Matthews v. State*, 2002 OK CR 16, ¶ 35, 45 P.3d 907, 919–920. The issue is not whether some other jury, or even this Court, might have reached a different conclusion, but whether there was sufficient evidence to support the verdict actually reached. *Id.; Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). We find sufficient evidence to support the jury's conclusion that Appellant acted with an intent to kill. Appellant's history of jealousy, his conduct in the days preceding the homicide, his scheme to get his wife to accompany him, alone, after she had moved out, the peculiar presence of a large knife in

Appellant's car, and Appellant's own statements, and the nature of the wounds inflicted, all support the jury's conclusion that Appellant deliberately meant to kill his wife. *Harris v. State*, 2004 OK CR 1, ¶¶ 44–45, 84 P.3d 731, 749. Proposition 3 is denied.

## C.  FIRST–STAGE INSTRUCTIONS

¶ 24 In Proposition 4, Appellant advances two complaints about the instructions given to the jury in the first stage of trial. Because he did not bring these complaints to the trial court's attention, we review only for plain error. *Torres v. State*, 1998 OK CR 40, ¶ 43, 962 P.2d 3, 17. Recognizing trial counsel's failure to make these arguments, Appellant appends an ineffective-assistance claim to this proposition as well.

■■ ¶ 25 First, Appellant complains that the trial court erred by giving the jury a superseded version of OUJI–CR (2nd) No. 10–27, dealing with the manner in which the jury was to consider the charged offense (First Degree Murder) versus the lesser-offense theory advanced by Appellant (First Degree Manslaughter). In *Graham v. State*, 2001 OK CR 18, ¶ 7 & n. 5, 27 P.3d 1026, 1028 & n. 5, this Court modified OUJI–CR (2nd) No. 10–27 to make it clear that a jury is not required to unanimously acquit the defendant on the charged offense before it can consider his guilt on any lesser offense. *Graham* was decided before Appellant's trial.

■■ ¶ 26 Appellant did not bring *Graham* to the trial court's attention. The trial court should instruct on the applicable law and use the Uniform Jury Instructions whenever possible; however, a deviation from the Uniform Instructions does not automatically result in reversible error. *Phillips v. State*, 1999 OK CR 38, ¶ 73, 989 P.2d 1017, 1037–38. The

---

**6.** Appellant incorrectly reads *Lewis v. State*, 1998 OK CR 24, ¶ 16, 970 P.2d 1158, 1166, to hold that a wife's acts of infidelity can constitute adequate provocation for killing her, if the husband's homicidal rage occurs close in time to his learning of the infidelity. In *Lewis*, the defendant killed his wife, and the trial court refused to instruct on heat-of-passion manslaughter; the court found that because the defendant became aware of the infidelity some time before the homicide, he had failed to show that he lacked a reasonable opportunity for his anger to cool,

which is another requirement of heat-of-passion manslaughter. *See* OUJI–CR (2nd) No. 4–97. Having found the defendant had a reasonable opportunity for his anger to cool, the trial court had no need to pass on whether the provocation was "adequate." This Court found no error in the trial court's determination on this point, and did not suggest that a mere suspicion of marital infidelity—or even a confession of same—would constitute "adequate provocation" for heat-of-passion manslaughter.

fact that the language of OUJI–CR (2nd) No. 10–27 was modified in *Graham* does not help Appellant, even though the modification was announced prior to Appellant's trial, because we have never found this Uniform Instruction to be an incorrect statement of the law. Relief was required in *Graham* only because the prosecutor suggested that the jury must unanimously acquit on the charged offense before it could even consider the lesser offense, *and* the trial court had omitted to give OUJI–CR (2nd) No. 10–27 at all. *Graham*, 2001 OK CR 18 at ¶¶ 3–6, 27 P.3d at 1027.[7] We simply took the opportunity in *Graham* to reword the instruction in an attempt to make it clearer. In this case, the trial court gave the version of OUJI–CR (2nd) No. 10–27 as it existed before *Graham*, and unlike the situation in *Graham*, none of the prosecutor's statements cited by Appellant can be said to have misstated the law on this point. We find no plain error here. *See Malaske v. State*, 2004 OK CR 18, ¶ 14, 89 P.3d 1116, 1120 (trial court did not err in using pre-*Graham* version of OUJI–CR (2nd) No. 10–27).

■ ¶ 27 Appellant also claims error because the jury was not expressly instructed that malice aforethought cannot be presumed from the mere act of taking a human life. We believe this is adequately addressed by OUJI–CR (2nd) No. 4–63, which tells the jury that all external circumstances surrounding the homicide are relevant to whether it was committed with a deliberate intent to take life. *Williams v. State*, 2001 OK CR 9, ¶¶ 34–38, 22 P.3d 702, 714. In closing argument, the prosecutor made such comments as, "You don't grab a knife ... and cut her across the throat without intending to kill her.... [I]ntent is formed then.... How could you run a knife across somebody's throat and not intend to kill them? ... You don't do that to somebody without inten[t] to kill." Appellant complains that without an explicit reminder that intent cannot be presumed from the fact of the killing itself, these comments invited the jury to hold the State to a lower burden in proving malice. We disagree. The prosecutor's comments simply asked the jury to consider the external circumstances surrounding the killing, as OUJI–CR (2nd) No. 4–63 advises. The manner in which Appellant used the knife is relevant to whether he intended to kill. *Huitt v. State*, 1977 OK CR 126, ¶ 19, 562 P.2d 873, 876. The instructions given were correct statements of the law; the prosecutor's comments thereon were proper in context; and because any objections on these issues would properly have been overruled, defense counsel was not derelict in failing to make them. *Cruse v. State*, 2003 OK CR 8, ¶ 11, 67 P.3d 920, 923. Proposition 4 is denied.

## D. PRE–MORTEM PHOTOGRAPH OF THE VICTIM

¶ 28 In Proposition 5, Appellant alleges he was denied a fair trial when the State, in the first stage of trial, introduced State's Exhibit 30, a photograph of the victim taken while she was alive. The candid color photograph, taken some seventeen years before on the couple's wedding day, shows Enriqueta smiling and wearing her wedding dress. Appellant claims this photograph was inflammatory and not relevant to any issue in the case. He concedes that our Legislature had, by the time of this trial, amended the Evidence Code to expressly permit such evidence, but he argues that the amendment is unconstitutional. Appellant objected to the photograph

---

7. Before *Graham*, OUJI–CR (2nd) No. 10–27 read:
    If you have a reasonable doubt as to which offense the defendant may be guilty of, you may find him/her guilty only of the lesser offense. If you have a reasonable doubt as to the guilt of the defendant on all such offenses, you must find him/her not guilty of any crime. *Graham* modified the instruction thus:
    If you are unable to agree unanimously that [defendant's name] is guilty of the charged offense, you may proceed to consider a lesser included offense upon which evidence has been presented. You are not required to determine unanimously that the defendant is not guilty of the crime charged before you may consider a lesser included offense. However, you must unanimously agree that the defendant is guilty of a particular criminal offense before returning a verdict of guilty on that offense.
    This instruction has since been incorporated into OUJI–CR (2nd) No. 10–24.

at the time it was admitted, preserving this claim for full appellate review.

¶ 29 The Oklahoma Evidence Code takes a liberal approach in favor of admissibility. All relevant evidence is presumed to be admissible. 12 O.S.2001, § 2402. Relevant evidence should only be excluded if its probative value is "substantially" outweighed by the danger of "unfair" prejudice to the opposing party. 12 O.S.Supp.2002, § 2403; *see also Mayes v. State*, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1309–1310 ("In dealing with the relevancy of evidence, we begin with the presumption that in determining whether to admit such evidence, the trial judge should lean in favor of admission"). In 2002, the Legislature amended § 2403 of the Evidence Code to provide that "[I]n a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive."

▮ ¶ 30 We turn first to Appellant's claim that § 2403, as amended, is unconstitutional. Initially, Appellant claims the amendment was a political move to appease victims' rights advocates. This may be true, yet Appellant offers no authority suggesting that a statute's constitutionality hinges on the politics behind it. Our task is simply to consider the statutory language in light of other relevant statutory and constitutional provisions. *State v. Young*, 1999 OK CR 14, ¶ 27, 989 P.2d 949, 955.

¶ 31 Appellant next claims that § 2403 is facially unconstitutional because it only permits prosecutors, not defendants, to offer photographs of a homicide victim. We disagree. The statute does not expressly bar a defendant from introducing such evidence, and we find nothing in the more general provisions of the Evidence Code which would prevent him from doing just that, so long as

the victim's appearance is somehow relevant to the issues in the case.[8]

▮ ¶ 32 Appellant goes on to assert that even if § 2403 is constitutional, it did not permit the photograph at issue here. As we recently pointed out in *Coddington v. State*, 2006 OK CR 34, ¶¶ 55–56, 142 P.3d 437, 452–53, and as Appellant himself concedes, § 2403 does not categorically permit *any* pre-mortem photograph of the homicide victim; the photograph must be an "appropriate" one. This adjective serves as a reminder that photographs which tend to distract from, or needlessly embellish, basic information about the victim may tip the scales toward inadmissibility. The requirement that such photographs be "appropriate" preserves the trial court's discretion in determining admissibility. If the court finds that the photograph is not appropriate—*i.e.*, that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise—then it should be excluded. Section 2403, as amended, is not immune to the overarching principles of admissibility found in the Evidence Code.

¶ 33 In this case, the prosecutor offered a single photograph of Enriqueta on the day she married Appellant. The photograph was not misleading; while the passage of seventeen years certainly can affect one's general appearance, the photograph was introduced through the couple's daughter Leticia, who testified that her mother's appearance had changed little since the photograph was taken. Our review of the crime-scene photographs corroborates this assessment. We agree with the State that while a photograph of a homicide victim in her wedding dress might, in other contexts, be an inappropriate evocation of sympathy, the facts of this case cast the photograph in a substantially different light.[9] Appellant and the victim had

---

8. As for any potential abuses of the statute, the fanciful scenarios Appellant envisions are well beyond the plain language thereof, and in any event they did not occur in this trial. Appellant speculates, for example, that in the future, prosecutors might attempt to offer photographs of the headstone at the victim's grave, or deliver closing

arguments from the cemetery. Neither of these scenarios is even remotely contemplated by § 2403.

9. In responding to defense counsel's objection, the prosecutor claimed that he had asked Enriqueta's family to supply several photographs of

been married some seventeen years. Even in the State's estimation, Appellant killed his wife out of jealousy, believing that she had been unfaithful to him. Appellant and the victim had three children, two of whom were placed in the difficult position of being called as witnesses at trial. The jury also heard evidence that after the crime, Appellant's mental health deteriorated, and that even at the time of trial, while he admitted killing his wife, he still claimed to believe she was still alive and loved and missed her very much. In short, the photograph at issue did not unfairly evoke sympathy for the victim so much as it underscored the tragic nature of this crime for all involved. We cannot say that State's Exhibit 30 unfairly prejudiced the jury against Appellant. The trial court did not abuse its discretion in admitting it, and Proposition 5 is denied.

## E. APPELLANT'S RIGHT TO CONSULAR ASSISTANCE

¶ 34 In Proposition 6, Appellant contends that his right to consular assistance was violated. As noted, Appellant is a citizen of Mexico. Both the United States and Mexico are signatories to the Vienna Convention on Consular Relations, 21 U.S.T. 77, 100–101 (hereafter *VCCR* ). This multinational treaty includes provisions relating to contact between foreign nationals in a signatory country (the "receiving State") and the consulate of their country of origin (the "sending State"). The treaty provides that "consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State." *VCCR*, Article 36, ¶ 1(a). To implement this provision, government officials of a receiving State, upon arresting or otherwise detaining a foreign national from a sending State, shall, "without delay," inform the person of his right to contact his consulate, and likewise inform the person's consulate that he has been so detained. *Id.* at ¶ 1(b).

¶ 35 After his arrest but before he was interviewed, Appellant was advised by police (1) that he had a right to remain silent and consult with a lawyer, and (2) that as a citizen of Mexico, he had a right to request assistance from the Mexican consulate. Speaking through an interpreter, Appellant not only agreed to talk to police without a lawyer present, but also declined his right to contact the Mexican consulate. On appeal, Appellant concedes that he was timely advised of his right to contact the Mexican consulate, but claims that "other state-sanctioned barriers" effectively denied him the right to consular assistance. Appellant complains that the government of Mexico was not permitted to intervene in his case and participate in his defense.

¶ 36 Appellant's argument is based on the assumption that a governmental party to the Vienna Convention on Consular Relations has a unilateral right to participate in the criminal prosecution its citizens in another signatory country, even without the citizen's consent. Appellant offers no authority to support such an assumption. To the contrary, the treaty makes clear that consular assistance cannot be forced on a foreign national: "[C]onsular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action." *VCCR*, Article 36, ¶ 1(c). In fact, Mexico's right to unilaterally intervene in Appellant's criminal proceeding is not squarely before us, because it is *Appellant*, not Mexico, who is making this claim, and Appellant himself lacks standing to do so. Proposition 6 is therefore denied. However, this does not end our discussion of Mexico's efforts to participate in Appellant's defense. While the Vienna Convention did not give Mexico the unilateral right to intervene in Appellant's case, Mexico's repeated attempts to offer defense counsel assistance before trial play an important role in our disposition of Appellant's ineffective-counsel claim, which we turn to now.

---

her, but that they had defaced or destroyed many photographs which also included Appellant as a subject, and that the photograph offered was the

least prejudicial of the lot. Defense counsel did not challenge this assertion or ask to view the other photographs.

## F. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 37 In Proposition 7, Appellant claims that defense counsel rendered ineffective assistance in the guilt stage of his trial by inviting the prosecutor to develop evidence concerning Appellant's future dangerousness. In Proposition 2, he claims defense counsel rendered ineffective assistance in the punishment stage of the trial by failing to conduct a meaningful investigation into potential mitigation evidence. Because both claims involve similar legal principles, we review them together.

¶ 38 In the guilt stage of trial, the defense called Dr. Montero, who had conducted a psychiatric evaluation of Appellant, to advance its theory that Appellant acted in a heat of passion. Montero characterized Appellant's actions in killing his wife as inconsistent with what Montero had concluded about Appellant's personality. Defense counsel specifically asked Montero whether, in his opinion, Appellant posed a "continuing threat as a violent person"; Montero opined that he did not. On cross-examination, the prosecutor further developed this line of inquiry, asking Montero to reflect on his assessment in light of (1) prior testimony that Appellant had been abusive toward his wife in the past, and (2) the fact that Appellant had attempted to escape from the county jail—a fact that had not yet been established through testimony. Then, in rebuttal, the prosecutor called Dr. Terese Hall, a psychologist from Eastern State Hospital where Appellant had undergone a competency evaluation, to testify that, in her opinion, Appellant posed a "moderate" risk of future violence.

¶ 39 Appellant claims that the issue of his future dangerousness had no place in the guilt stage of the trial, and that trial counsel was ineffective by opening the door to the subject on direct examination of Dr. Montero. We agree that a defendant's future dangerousness is not, strictly speaking, germane to whether the defendant is guilty of first degree murder; it becomes relevant only if the trial progresses to a capital sentencing stage and the State has alleged the "continuing threat" aggravating circumstance in support of the death penalty. 21 O.S.2001, § 701.12(7). However, the "continuing threat" inquiry necessarily invites assessment of the defendant's past conduct, and this same conduct may well be relevant to issues raised in the guilt stage of a capital murder trial. *See, e.g., Harris v. State,* 2004 OK CR 1, ¶ 33, 84 P.3d 731, 746 (psychological evidence relevant to continuing threat aggravator was properly admitted in guilt stage to rebut a claim of diminished capacity). That was the case here.[10]

¶ 40 The State argued that Appellant's prior treatment of his wife supported the conclusion that he intended to kill her. In turn, defense counsel attempted to show that the homicide was a sudden impassioned response, and used Dr. Montero's testimony about Appellant's psychological makeup—in essence, his character—to support that claim. By formally placing Appellant's character for non-violence in issue, defense counsel opened the door to inquiry about other acts which might bear on this character trait, such as Appellant's attempt to escape from jail. 12 O.S.2001, §§ 2404(A)(1), 2405(B); *Malicoat v. State,* 2000 OK CR 1, ¶ 40, 992 P.2d 383, 403–04; *Douglas v. State,* 1997 OK CR 79, ¶¶ 24–25, 951 P.2d 651, 663.

¶ 41 We tend to agree that defense counsel needlessly used the term "continuing threat" in questioning Dr. Montero, and that because the prosecutor had made his point in cross-examination of this witness, rebuttal testimony about Appellant's risk of future violence was not particularly relevant to the issue of Appellant's guilt. Nevertheless, we cannot say that this temporary shift in focus, from past conduct to future dangerousness, undermined confidence in the outcome of the guilt stage of the trial. The predictions were based on evidence that was itself relevant to the guilt-innocence determination. Whether or not counsel's tactic was professionally unreasonable, we cannot say it was likely to

---

**10.** Similarly, in a capital murder trial, evidence about the manner of death is almost invariably presented in the guilt stage, even though it may be equally relevant to the capital-sentencing determination of whether the murder was "especially heinous, atrocious, or cruel." *See Malicoat v. State,* 2000 OK CR 1, ¶ 42, 992 P.2d 383, 404. That was the case here as well.

have caused prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Proposition 7 is denied.

¶ 42 In Proposition 2, Appellant alleges that his trial counsel failed to conduct a meaningful investigation for potential evidence in mitigation of a death sentence, depriving him of his right to effective assistance of counsel and to a fair sentencing proceeding. Based on the supplementary materials Appellant filed in conjunction with this claim, we remanded the matter to the district court for an evidentiary hearing. *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S. Ch. 18, App. (2007). The hearing was held January 17–20, 2006, and a record of that hearing was submitted to this Court for review. The trial court filed its findings of fact and conclusions of law in this Court on May 11, 2006. The parties also filed supplemental briefs based on the evidence adduced at the hearing. In addition, the Government of the United Mexican States (hereafter "Mexico") was granted leave of Court to file an *amicus* brief based on the evidence presented at the hearing. Our review of this proposition encompasses all of these materials, as well as the trial record itself.[11]

¶ 43 We begin by reiterating the general standards for reviewing a claim of ineffective assistance of counsel. Appellant must demonstrate that trial counsel's performance was so deficient as to have rendered Appellant, in essence, without counsel, in violation of the Sixth Amendment; we assess counsel's performance for reasonableness in light of prevailing professional norms. Appellant must also demonstrate that the allegedly deficient performance caused prejudice; there must be a reasonable probability that the actions in question undermine confidence in the outcome of the proceedings. We begin with the presumption that counsel's conduct was reasonable, and we accord great deference to questions of trial strategy, recognizing that there are many ways to handle any given case, and that counsel must make many strategic decisions along the way. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Browning v. State,* 2006 OK CR 8, ¶ 14, 134 P.3d 816, 830–31.

¶ 44 In recent years, the Supreme Court has issued a number of decisions applying the *Strickland* standards to the unique responsibilities in preparing a capital mitigation case. In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Court vacated the defendant's death sentence after finding that trial counsel's failure to fully investigate available mitigation evidence constituted deficient performance that could have affected the sentencing proceeding. In *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Court again vacated a death sentence where trial counsel's mitigation investigation proved wanting. And in *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), the Court vacated the defendant's death sentence where trial counsel had neglected to review the prosecutor's file, which contained information leading to valuable sources of mitigation evidence.

¶ 45 Likewise, this Court has recognized the critical importance of mitigation evidence in a capital case. "It is beyond dispute that mitigating evidence is critical to the sentencer in a capital case." *Warner v. State,* 2001 OK CR 11, ¶ 15, 29 P.3d 569, 575 (citations omitted). In *Garrison v. State,* 2004 OK CR 35, 103 P.3d 590, we vacated the defendant's death sentence based on trial counsel's failure to present such evidence. We found that while trial counsel wisely attempted to attack the relatively weak evidence of the defendant's guilt, nevertheless, counsel should also have anticipated the "very real possibility" that the defendant would be convicted, and should have realized that if he were, the "next best hope" was to work for a sentence less than death by focusing on aspects of the defendant's life history which might explain why he committed the crime. *Id.* at ¶ 167, 103 P.3d at 619.

¶ 46 *Strickland* requires that a claim of ineffective counsel be assessed in light of

---

11. Appellant's motion to supplement the record of the evidentiary hearing with a corrected copy of an exhibit admitted therein is **GRANTED.**

the particular circumstances of the individual case. *Williams, Wiggins,* and *Rompilla* each applied the *Strickland* standard to a different set of facts. Yet those cases, and our own cases, share the acknowledgment that mitigation evidence can, quite literally, make the difference between life and death in a capital case. While we give strong deference to the district court's findings of fact and conclusions of law following the evidentiary hearing on trial counsel's performance, the ultimate issue of whether counsel was ineffective is one for this Court to determine. Rule 3.11(B)(3)(b)(iv), *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S., Ch. 18, App. (2006). With these principles in mind, we now address whether trial counsel's preparation for the punishment stage can be considered constitutionally acceptable.

¶ 47 Lead defense counsel was retained by Appellant's family in April 2002. Trial was held in early February 2003. Counsel hired an associate to assist in the preparation of motions and the punishment stage of the trial. That associate left the firm in December 2002, about a month before trial. Lead counsel hired a second associate in January 2003, again primarily to work on the punishment-stage issues. The record shows that while lead counsel had very little capital experience, the associates charged with preparing for the capital sentencing stage had even less.[12]

¶ 48 Even though Appellant declined an invitation to contact the Mexican consulate on his arrest, consular officials were notified about his case, and they enlisted the help of the Mexican Capital Legal Assistance Program (MCLAP) to communicate with defense counsel.[13] Attorneys working on Mexico's behalf were in contact with defense counsel in the summer of 2002, offering, among other things, sample motions to seek court funds for experts and other services, including a mitigation investigation.[14]

¶ 49 Despite the voluminous evidentiary hearing, and testimony from all three defense attorneys involved in the case, the actual defense strategy with regard to mitigation remains elusive to us. Several conflicting explanations were offered: (1) that defense counsel did not know the court could be petitioned to provide additional funds for mitigation investigation; (2) that counsel knew additional funds could be applied for, but did not believe the court would approve them; and (3) that no additional funds were sought because counsel believed their mitigation work was thorough and sound. Each of these explanations is belied by the record. As noted, counsel for Mexico had forwarded caselaw and other information to trial counsel on how to seek court funds for mitigation assistance. At a hearing just days before trial, where counsel for Mexico appeared *pro hac vice* and expressed concern about the course of the second-stage preparation, the court told defense counsel that it would be very accommodating to any properly submitted request for additional funds. None was ever filed. No substantive mitigation work was done until a week or so before trial, when new associate counsel, hired just a few weeks before, spoke with a few family members for an hour or two about testifying in the punishment stage.[15] As noted earlier, the testimony of the three family members who testified in the punishment stage comprised less than fifteen pages of trial tran-

---

12. Lead counsel testified that he had been involved in one capital case in the past. The first associate he employed to assist him had no capital experience; his successor had "third chaired" one capital murder trial as an intern.

13. Mexico has a long history of providing financial and legal support to its nationals charged with capital crimes in the United States. The Mexican Capital Legal Assistance Program was established to provide experienced legal, forensic, and financial support to defense counsel around the country who represent Mexican nationals charged with capital crimes.

14. In October 2002, trial counsel applied for and received $5000 to hire a psychiatrist and an investigator, and to pay for a transcript of the preliminary hearing. However, the psychiatrist's principal role at trial was to support the "heat of passion" defense, and the investigator's primary task was to investigate first-stage issues.

15. At the evidentiary hearing, lead defense counsel testified that he also anticipated calling Appellant's son to testify in mitigation, and that it was a "real surprise" when he backed out at the last minute, allegedly under pressure from the victim's family.

script. With little elaboration, these witnesses told the jurors that Appellant had been a good person, and asked them to spare his life.

¶ 50 There is no doubt that this case presented several challenges from the very beginning. Appellant had spent the first thirty years of his life in a small town in Mexico. He spoke very little English. Appellant's interrogation by police required an interpreter. Lead defense counsel spoke no Spanish. His first associate, who left the firm about a month before trial, spoke no Spanish. The defense investigator spoke no Spanish. The second associate, tasked with preparing the mitigation case less than a month before trial, spoke some Spanish, but an interpreter was still necessary. While a certified interpreter was funded by the trial court and used at the proceedings, at other times counsel "made do" with such unlikely interpreters as the brother of the murder victim and Appellant's twelve-year-old nephew. Regardless of how proficient these persons might have been in both languages, whether they were competent to relate matters of legal significance, and whether they did in fact communicate the true nature of the proceedings to Appellant effectively, are issues of considerable concern.[16]

¶ 51 There were also logistical challenges which bore directly on investigating and presenting a proper mitigation case. Practically anyone who could offer insight into Appellant's past lived in Mexico. Proficiency in Spanish was essential, not just for interviewing potential witnesses, but for reviewing school, medical, and other records. Indeed, these challenges were apparent at the evidentiary hearing. Immigration paperwork caused the hearing to be delayed. There were some translation difficulties at the hearing itself.[17] Yet, these challenges were overcome.[18] Defense counsel has a duty to take all necessary steps to ensure that available mitigating evidence is presented. *See Warner,* 2001 OK CR 11 at ¶ 16, 29 P.3d at 575 (defense counsel ineffective for failing to follow procedure to request a continuance for purposes of securing attendance of mitigation witness). Had trial counsel diligently formed and implemented a mitigation strategy earlier in the case, these challenges would have been apparent, and could have been met by seeking funds from the court and specifying why they were necessary.

¶ 52 At the evidentiary hearing, Appellant presented a number of witnesses who knew him before he took his family to the United States. Many of them offered unique and moving vignettes about Appellant's good character; many of them also knew the victim and had a favorable opinion of her as well.[19] Some of these witnesses made sub-

16. The record suggests that Appellant's family instructed the nephew not to alarm Appellant with the information he was supposed to relay. In addition, at the evidentiary hearing, lead defense counsel testified that due to the language barrier, it was "very difficult to discuss with [Appellant] the plea offer extended by the State and the reasons why we believed that he should accept the offer."

17. After the hearing, appellate defense counsel moved this Court to require the court reporter's tapes of the hearing to be re-translated, alleging several examples of inaccurate translation from the certified interpreter employed at the hearing. Attached to that motion was a copy of an affidavit attesting to inaccuracies in the translation. We find the testimony as currently transcribed, read in context, is not so confusing as to require re-translation. Appellant's Motion to Substitute Original Affidavit for Faxed Copy is **GRANTED.** His Motion to Have Court Reporter's Tapes of Evidentiary Hearing Re–Transcribed is **DENIED.**

18. We commend the district court, and counsel for both parties, for clearing these hurdles and presenting a very thorough examination of the issues on remand.

19. To cite but a few examples, one witness, Father Felix Pinoncely, officiated at the wedding of Appellant and Enriqueta, and had known Appellant through the local Catholic church since Appellant was a child. He testified that as a young man, Appellant volunteered to help on several church projects. Another witness, Jacobo Schellemberg, is a farmer in a Mennonite community near Appellant's home town. Schellemberg testified that Appellant worked for him for about ten years before moving to the United States. He recalled that Enriqueta had medical problems, that Appellant was constantly worried about her, and that he dutifully took off work to take her to the doctor. Schellemberg also spoke of a close friendship with Appellant that transcended their different ethnic and cultural backgrounds. Testimony was also received that on one occasion, Appellant had donated blood to a Mennonite man, which said as much about the Mennonites' esteem for Appellant as it did about Appellant's willingness to help others. Yet an-

stantial sacrifices to attend the evidentiary hearing. The local Catholic priest, who had known Appellant since he was a child, was 62 years of age, partially blind, and in poor health; yet he testified at the hearing and offered to return to the United States as often as necessary to speak on Appellant's behalf.[20]

¶ 53 One important purpose of mitigation evidence is to humanize the defendant in the eyes of the jury and, if possible, to explain what might have driven him to commit the crime. *See Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir.2000). We find the Supreme Court's analysis in *Wiggins* particularly relevant here. In *Wiggins*, defense counsel's mitigation investigation consisted of reviewing a psychological report, a presentence report, and a report from a social-services agency. The Court faulted counsel for "abandon[ing] their investigation" after having acquired "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524–25, 123 S.Ct. at 2537. In fact, the Court characterized counsel's failure to investigate as resulting more from inattention than anything else. *Id.* at 526, 123 S.Ct. at 2537. Under the circumstances, the Court found that a broader and deeper investigation into collateral sources of information about the defendant's background would have led to evidence which could have affected the sentencing proceeding.

¶ 54 Counsel does not have an obligation to introduce any and all evidence that might conceivably be considered mitigating. *Wiggins*, 539 U.S. at 533, 123 S.Ct. at 2541; *Lott v. State*, 2004 OK CR 27, ¶ 163, 98 P.3d 318, 357. But counsel's decisions about the na-

ture and quantity of mitigating evidence must be based on reasonable professional judgment, which requires experience, training, and some basic research into what evidence is available and how it might make a difference. We simply cannot discern any real, coherent mitigation strategy in this case. Even if counsel's brief, eleventh-hour discussion with Appellant's parents and sister about testifying in the punishment stage could be deemed sufficient witness preparation, it surely does not begin to approach a true mitigation investigation. Counsel were untrained in what to look for and how to go about looking for it. Their assessments of the situation were often inconsistent with each other, and at times internally inconsistent as well. The amount of deference given to counsel's strategic decisions depends on the amount of investigation that went into them. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066. We find trial counsel's approach to the mitigation aspect of this case constitutionally unacceptable.

¶ 55 We must now consider whether counsel's failure to investigate, develop, and present an acceptable mitigation case was prejudicial to Appellant. The trial court agreed with trial counsel's opinion that additional mitigating evidence would only have been cumulative to that which had been presented at trial. We believe this conclusion overlooks the *qualitative* difference between having a family member generally ask the jury to spare the life of the defendant, and having third parties offer the jury *more objective and specific* examples of *why* the defendant's life should be spared. Effective capital mitigation requires at least looking

other witness, Javier Gomez, a teacher and long-time friend of Appellant's, testified that Appellant was the godfather to his son. When Gomez's son died unexpectedly, Appellant borrowed money to buy the boy's casket and asked the Mennonite farmers to lend him a truck to carry it in. Appellant allegedly refused to let Gomez pay him back for these efforts. Gomez also recalled that when Appellant began courting Enriqueta, he asked Gomez to assist him in serenading her; the two men built a bonfire next to her parents' home and sang to her.

20. We find it ironic that before Appellant's family retained counsel for him, the trial court had appointed the Capital Trial Division of the Oklahoma Indigent Defense System (OIDS) to this case, and that OIDS, later appointed to represent Appellant on direct appeal, was able to marshal substantial mitigating evidence. This was accomplished with invaluable help from attorneys and mitigation specialists working on behalf of the government of Mexico—the same professionals who had repeatedly offered assistance to trial counsel, and who testified that a thorough mitigation investigation might have been available before trial, had trial counsel first sought funds from the district court to conduct it.

for more than a "few naked pleas for mercy." *See Rompilla,* 545 U.S. at 393, 125 S.Ct. at 2469. Jurors may well understand that a defendant's mother will almost always extol the virtues of her son; but they may give different treatment, and perhaps greater weight, to the testimony of less biased witnesses which illuminates the man whose life is in their hands.

¶ 56 At the hearing, lead defense counsel also suggested that belaboring the mitigation testimony might have "bored" the jury and exacerbated some sort of latent racial animosity. These assessments are simply not supported by the record. We conclude that the stories of Appellant growing up and doing good things in his rural Mexican community might well have resonated with citizens of a rural Oklahoma county. In *Garrison,* 2004 OK CR 35, ¶ 167, 103 P.3d at 619–620, we found that evidence of the defendant's "horrendous past," which trial counsel failed to present, could have moved at least one juror to hold out in favor of a sentence less than death. Most of the mitigating evidence counsel failed to present in this case was of a different nature, as it highlighted positive aspects of Appellant's character and background, but it was powerfully mitigating nonetheless.

¶ 57 This case may fairly be called a "second stage" case. The fact that Appellant killed his wife was undisputed. The evidence of a design to effect death was straightforward and considerable, and the legal validity of the "heat of passion" defense was tenuous. The manner of death was visually gruesome. The only real question appeared to be what punishment was appropriate. Most of the evidence supporting one aggravating circumstance (whether Appellant constituted a continuing threat to society), and all of the evidence supporting the second (whether the murder was especially heinous, atrocious, or cruel), was presented in the guilt stage of the trial.

¶ 58 An aggressive mitigation effort, initiated early in the case, would not only have humanized Appellant in the eyes of the jurors, but might also have helped explain his conduct. To give one example, the State characterized Appellant as an abusive monster who was unreasonably jealous and controlling over his wife. The defense did little to alter this picture. Yet testimony adduced at the evidentiary hearing showed that, by all accounts, Appellant's personality changed after he moved to the United States. He became more serious, shy, and withdrawn. There was also testimony that when family from Mexico came to visit in 2001, Appellant confided to them that Enriqueta had been unfaithful, and gave some details about having confronted her on the issue. Had defense counsel conducted a proper investigation, this evidence would have been relevant to show that Appellant's jealousy in the months leading up to the homicide might not have been unfounded, and that Appellant's marital problems may have had a marked effect on his mental health.[21] Even Dr. Hall, who evaluated Appellant for competency at the State's request before trial, pointed out in her report that additional information about Appellant's background would be helpful to more fully assess his mental health.

¶ 59 Trial counsel's efforts to challenge his client's competency, and to seek court funds for the employment of a psychiatric expert for trial, were commendable. But the prospect that, at some point, the jury might be deciding whether Appellant should live or die was one that demanded attention from the beginning. There was undisputed testimony at the evidentiary hearing that at one point well into their deliberations, the jury was evenly split on whether to impose the death penalty. At the evidentiary hearing, defense counsel pointed to this fact as a sign that the mitigation strategy was successful. We view it as strongly suggesting how outcome-determinative a real mitigation investigation might have been.

¶ 60 At the evidentiary hearing, there was much discussion over whether a proper capital defense strategy necessarily required the services of a so-called "mitigation specialist," such as the ones employed on Appellant's

---

21. At trial, the couple's daughter, called by the State to describe Appellant's jealous and controlling attitude toward his wife, testified that on one occasion he interpreted a cat prowling outside the home as one of Enriqueta's boyfriends calling for her.

direct appeal. We believe the real issue is whether defense counsel understands what kind of mitigation evidence can make a difference, what kind of mitigation evidence is available, and whether counsel makes reasonable efforts to obtain it. We agree, in principle, with the trial court's conclusion that "any attorney, investigator, social worker, mental health professional, or other person is capable of obtaining such information *so long as they are actively looking for it*" (emphasis ours). Here, however, counsel was not actively taking reasonable steps to assemble a mitigation case. We reject the trial court's suggestion that it was the responsibility of Appellant and his family to understand the nature of mitigation on their own, and to bring relevant evidence to defense counsel's doorstep.[22] In this case, counsel simply did not devote the efforts which have been recognized, by the Supreme Court and this Court, as likely to make a difference between life and death.[23]

¶ 61 Our decision today does not set a "magic number" of witnesses to be called in mitigation of the death sentence, or number of persons to be interviewed for such purpose. It does not make effective capital representation dependent upon the employment of any particular type of specialist, or presentation of any particular type or amount of testimony. We simply find that some of the evidence presented at the evidentiary hearing—evidence which trial counsel admitted he was completely unaware of—was of such character as to undermine confidence in the death sentence imposed, and that counsel's choice not to even pursue this line of mitigation evidence was professionally unreasonable under the circumstances.

¶ 62 Generally, prejudicial error in the punishment stage of a capital trial would warrant vacating the death sentence and remanding to the district court for re-sentencing. Under the particular circumstances of this case, however, we find that a modification of sentence is more appropriate. As noted above, the evidence supporting one of the two aggravating circumstances (continuing threat to society) was weak. Appellant had no known criminal record. Evidence of Appellant's mental illness was considerable, and tended to explain what few instances of violent conduct the State was able to muster. Appellant's mental illness may also have played a part in his repeated rejection of the State's plea offer. A substantial amount of compelling mitigation evidence was presented at the evidentiary hearing, where it was subjected to vigorous adversarial testing. All of the mitigating evidence, viewed together, clearly outweighed the evidence supporting the aggravating circumstances. Under these unique circumstances, and in the interests of justice, we find that Appellant's sentence should be **MODIFIED** to life imprisonment without the possibility of parole. 22 O.S. 2001, § 1066; 21 O.S.2001, § 701.13; *Ullery v. State*, 1999 OK CR 36, ¶¶ 44–46, 988 P.2d 332, 352–53; *Mooney v. State*, 1999 OK CR 34, ¶¶ 57–58, 990 P.2d 875, 891; *Washington v. State*, 1999 OK CR 22, ¶¶ 49–64, 989 P.2d 960, 975–980; *Cudjo v. State*, 1996 OK CR 43, ¶¶ 27–32, 925 P.2d 895, 900–02; *Malone v. State*, 1994 OK CR 43, ¶¶ 40–41, 876 P.2d 707, 718–19; *Livingston v. State*, 1990 OK CR 40, ¶¶ 10–11, 16, 795 P.2d 1055, 1058–59. Appellant's other complaints relating to the sentencing phase of the trial are rendered moot or otherwise denied.[24]

**22.** *Cf. Smith v. State*, 2006 OK CR 38, ¶¶ 38–42, 144 P.3d 159 (trial counsel was deficient in not explaining critical need for psychological expert, not seeking court funds for such services if defendant could not pay for them, and instead accepting client's attitude of resignation that such services would not help her anyway).

**23.** We find the brief testimony of Appellant's sister, in the punishment stage, particularly telling:

"If you would know where we live, ask the people, they would tell you how he is.... I ask you please, if you knew my brother, if you would ask the people from my town about by brother, the whole town is saddened because of my brother, and everybody knows him." The jury deciding Appellant's fate might well have wondered: If what Appellant's sister said was true, then why were *none* of these people called to testify?

**24.** In Proposition 11, Appellant complains of certain comments made by the prosecutor in second-stage closing argument, comments which were not so outrageous as to require discussion here. Although the title of Proposition 8 purports to challenge the constitutionality of the

## DECISION

¶ 63 The judgment of the district court is **AFFIRMED.** The sentence of death is **MODIFIED** to **LIFE IMPRISONMENT WITHOUT POSSIBILITY OF PAROLE.**

A. JOHNSON, J.: concurs.

LUMPKIN, P.J. and CHAPEL, J.: concur in results.

LEWIS, J.: concurs in part/dissents in part.

Chapel, JUDGE, concur in results:

¶ 1 I concur in affirming the conviction in this case, and I concur in modifying the sentence to life without parole. In fact, with the exception of Proposition III, I otherwise agree with the analysis of and would join the majority's well-reasoned and thoughtful Opinion. I cannot, however, agree with the Opinion's analysis of Proposition III. The Appellant's defense at trial was that he acted in a heat of passion and without malice aforethought in killing his wife. Under these circumstances I believe that the trial court should instruct on the heat-of-passion defense and upon the State's burden to disprove it, where the defense is raised as an affirmative defense and adequately raised by the evidence. *See* my dissent in *Hogan v. State,* 2006 OK CR 19, 139 P.3d 907, 937–44. However, under the facts of the current case, I find that the evidence is sufficient to support Appellant's first-degree murder conviction and that his conviction is rightly affirmed.

"heinous, atrocious, or cruel" aggravator, the argument itself deals with whether the jury was properly instructed on the meaning of those terms. As to the title of this proposition, we have rejected constitutional vagueness and overbreadth challenges to this aggravator many times before. *See Murphy v. State,* 2002 OK CR 24, ¶¶ 36–37, 47 P.3d 876, 883–84. The substance of the argument is mooted by our disposition of this case. In part of Proposition 9, Appellant claims that due to instruction error, the jury was prevented from considering guilt-stage evidence as it might pertain to the aggravating and mitigating factors at issue in the punishment stage; again, this argument is mooted by the modification of sentence. Appellant's constitutional challenge to the "continuing threat" aggravator, in part of Proposition 10, is one we have rejected many times in the past. *Murphy,* 2002 OK CR 24 at

LEWIS, Judge, concurs in part/dissents in part.

¶ 1 I concur with the majority opinion insofar as affirming the conviction. I dissent to the modification to life without parole.

¶ 2 I am of the opinion that the appropriate remedy for an improper sentencing is to remand the case back to the trial court. Then a properly instructed jury, hearing all properly admissible evidence, could decide the appropriate punishment for Appellant. I agree that the mitigation strategy in this case was deficient, however, I dissent to taking the issue of punishment away from the jury.

¶¶ 37–39, 47 P.3d at 884. Propositions 9 and 10 also challenge the sufficiency of the evidence to support the two aggravating circumstances alleged by the State and found by the jury. While the jury's findings on these issues are now moot, the trial court's preliminary decision to submit them to a jury was sufficiently supported by the evidence. Appellant's cumulative-error argument in Proposition 12 is also moot to the extent it bears on the sentence imposed; we find no accumulation of error undermines confidence in the jury's verdict of guilt. Finally, Appellant's pleadings filed December 4 and 8, 2006, relating to the applicability of 21 O.S. § 13.1 and *Anderson v. State,* 2006 OK CR 6, 130 P.3d 273, are **DENIED** as untimely. Rule 3.4(F), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22 O.S., Ch. 18, App. (2006).